110 So.2d 545

STATE of Louisiana ex rel. Suzanne R. COLLINS

v.

Nereus W. COLLINS, Sr., et al.

No. 44427.

March 23, 1959.

Rehearing Denied April 27, 1959.

Harry V. Booth, Leonard L. Lockard, John R. Pleasant, Joseph C. LeSage, Jr., John T. Carpenter, Shreveport, for petitioners.

Herbert C. Harrison, Shreveport, for respondent.

John M. Madison, Shreveport, for amicus curiae.

McCALEB, Justice.

Mr. and Mrs. Nereus W. Collins, Sr., and their attorney, Whitfield Jack, having been found guilty of contempt of court, and each sentenced to a fine of $100 and to serve 10 days in jail, for failing to produce the Collins' grandchild in court in compliance with an order issued in a habeas corpus action instituted by the mother of the child and of conspiring with the father to spirit away the child from the jurisdiction of the court, applied to this Court and were granted a writ of certiorari to review the validity of the proceedings.

We find the facts essential to a consideration of relators' complaints to be as follows:

Suzanne Richard, the mother of the infant, was domiciled in New York City in 1956, being at that time married to a lawyer named Gerson L. Schweller. She and her husband separated on June 10th of that year and, in the following September, she met Nereus W. Collins, Jr. Within two months, she and her eight-year old son by her first marriage (Schweller was her second husband) moved into the apartment of Collins, Jr., in New York City, where they lived together until the Fall of 1957. During their relations, re-

spondent became pregnant and, in the latter part of October, 1957, Collins, Jr., brought her and the child of her first marriage to the home of his parents in Shreveport, where the baby herein involved was born on December 3, 1957.

In January, 1958 respondent left the Collins household for New York to arrange for the procuring of a divorce from Schweller.[1] Collins, Jr. remained in Shreveport with his parents until April of 1958, when he moved to Mexico with the intention of making a permanent home there. At the suggestion of Schweller, respondent went to Alabama to reside for the purpose of acquiring a legal domicile and instituted an action for a divorce against him in Russell County. Schweller made an appearance in that suit in which it was alleged and admitted that the parties had not lived together since June 10, 1956 and that no children had been born of the marriage. A judgment of divorce was obtained on April 29, 1958 and respondent immediately left for Mexico, where she joined Collins, Jr. On August 18, 1958 they were married in that country.

Meanwhile, the Collinses, Srs., had in their possession the baby, which was under their care and control since its birth, until December 14, 1958.

The marriage of respondent and Collins, Jr., was a failure and the parties separated within several weeks, Collins, Jr. returning to Shreveport and respondent to New York. The latter stopped over in Shreveport to see her baby on her trip from Mexico.

Shortly after his arrival in Shreveport, Collins, Jr., filed an affidavit in the Juvenile Court in which he stated that his child had been abandoned by its mother while living with him at the home of his parents within one month after its birth and that, in order for the child to receive adequate care and to prevent its being removed without an opportunity first being had for the court to inquire into its best interest, he desired to voluntarily relinquish the care, custody and control of the child and place it under the protection of the court.[2]

Acting on this affidavit, one of the officers of the Juvenile Court filed a petition to have the child declared neglected and placed under the control of the court. Respondent, having been notified by letter that a hearing on the petition would be held on November 14, 1958, appeared on the appointed day and sought to obtain custody of the child.

Collins, Jr., was not there, he having previously left for Mexico. However, the

1. Subsequent to her departure, the Colinses sent her eight-year old son of her first marriage to his father in New York.
2. This move by Collins, Jr., undoubtedly stemmed from a plan to secure for his

parents the legal custody of the infant, so that respondent could not acquire its care and control in habeas corpus proceedings.

Collinses, Seniors, attended the hearing and presented evidence in support of the petition. They both testified that their son was ill; that he had no means save a small monthly pension paid him by the United States Government, with which to support himself and that they would hesitate to have the child placed in either his custody or in care of respondent, whom they regard as utterly irresponsible.

Respondent also testified, stating that she was living with an aunt in New York and that she had obtained employment and was able to adequately care for her child.

The judge of the Juvenile Court, however, dismissed the case, correctly holding that the child could not be considered as abandoned or neglected and, further, that the issue of its custody and care was a matter which should be determined by the courts of general jurisdiction in a habeas corpus proceeding.

Upon learning of the decision of the Juvenile Court, Collins, Jr., returned to Shreveport on November 17, 1958, according to the testimony of his parents, for the purpose of taking the child back to Mexico. Nevertheless, he was still visiting his parents' home on December 8, 1958, when respondent instituted the habeas corpus proceeding against the Collinses, Seniors, in which she sought the custody of her baby, and an order issued on that day commanding them to produce the child in court on December 16th at 10:00 a. m. This order was served on the Collins Seniors in person on the following day and Mr. Whitfield Jack was consulted by them and employed as their counsel. On December 13th Collins, Jr., accompanied by his mother and father, consulted Mr. Jack as to his legal rights and was advised by counsel that his right to have custody of the child was equal, if not superior, to that of respondent, its mother, and that, since he, Collins, Jr., had not been made a party defendant to the habeas corpus proceeding he was at liberty to take the child out of the possession and control of his mother and father and carry it to his home in Mexico. Apparently, the theory upon which this advice was based was that the Collinses, Seniors, never had custody but only possession of the child; that no court order was being violated by anyone and that Collins, Jr., was merely exercising the right already vested in him as legal custodian.

Acting on this advice, Collins, Jr., left Shreveport for Mexico with the child on December 14, 1958, two days before the return date of the writ of habeas corpus. For this journey, he was substantially assisted by his parents, his father lending him $100 for travelling expenses and his mother supplying him with the family car for the trip.

On December 16th, the Collinses, Seniors, appeared in court with their coun-

sel, Mr. Jack, and filed their return to the order which was in essence a general denial.[3]

At the trial of the habeas corpus proceeding, the Collinses, Seniors, testified as to their inability to produce the infant stating, in substance, that they had turned it over to their son on advice of counsel. At the conclusion of the evidence, the judge made the rule absolute[4] and ordered the Collinses Seniors, to produce the child in court within four days, otherwise, he would hold them in contempt of court. Following this order, relators, with the assistance of their counsel, telephoned to their son, who had arrived in Mexico with the child, and endeavored to prevail upon him to return it. He refused.

On December 22, 1958, respondent filed a petition requesting the court to punish the Collinses, Seniors, for contempt, it being alleged that they committed contempt (1) in sending or permitting the child to be taken away after having been served with the habeas corpus order and (2) in failing to comply with the order and judgment of the court of December 16, 1958. As soon as this proceeding was filed, the judge issued a bench warrant for the Collinses, Seniors, and at 11:00 a. m. they were arrested and confined by the sheriff in his office. Bail was refused and they were held until two o'clock that afternoon, at which time Mr. Jack appeared with them on the order of the judge. The judge then told the Collinses, Seniors, and Mr. Jack that he considered that they were guilty of contempt, both in and out of the presence of the court, and sentenced them each to ten days in jail and a fine of $100.

Counsel sought to recuse the judge and also moved for a continuance. These motions were denied. Nevertheless, the judge allowed them to introduce evidence in support of their pleas that they were not in contempt and that, if a contempt was com-

---

3. This return was obviously violative of Article 808 of the Code of Practice which requires the respondent in a habeas corpus case, who has held the person in confinement or detained him within three days preceding the service, or has transferred the custody to another, to state particularly in his answer " * * * to whom, at what time, for what cause, and by what authority he made the transfer."

In State ex rel. Doran v. Doran, 215 La. 151, 39 So.2d 894, 896, it was stated that, upon the respondent's failure to comply with this Article of the Code of Practice, it was the duty of the judge to decline to proceed with the hearing " * * * until the subject child was either produced in court or a satisfactory explanation given by Doran as to why it could or should not be produced. If the respondent failed to comply with such an order, then the trial judge should have held him in contempt of court."

4. Manifestly, it was fallacious for the Collinses to have the court hear evidence on whether the mother was entitled to custody of her child. Collins, Jr., on advice of counsel, had rendered sterile the court's order to produce it, so the Collinses could not lose. If the judge had denied the mother relief, they would prevail and, if he granted her custody, he could not enforce the writ.

mitted, it was outside of the presence of the court. This evidence did not affect the judge in his ruling, it being his position that a contempt was committed in the presence of the court when Mr. Jack stated to him that the Collinses, Seniors, had acted on his advice to their son that he (Collins, Jr.) had the legal right to take the child. Indeed, it was the judge's opinion, and he forcefully reiterates it in his return to the writ issued herein, that the Collinses, Seniors, and their son, counselled by Mr. Jack, conspired to thwart and obstruct the order of the court by spiriting the child away from its jurisdiction to a foreign country.

■ Habeas corpus is an ancient writ which has for its purpose the protection of personal liberty. Of common law origin, this writ has been guaranteed under Federal and State Constitutions, it providing a speedy and efficient method of "affording a judicial inquiry into the legality of the restraint under which a person is held". State ex rel. Doran v. Doran, 215 La. 151, 39 So.2d 894, 896. It has been well stated in 25 Am.Jur. "Habeas Corpus" Section 145, page 244, that:

"It is the duty of all persons to respect and obey a writ of habeas cor-

pus, and every person who unlawfully disobeys its commands or unlawfully resists or counsels resistance to its execution is in contempt of court and may be summarily punished therefor. Thus, if the writ is disobeyed by the person to whom it is directed, application for an attachment for contempt may be made to the court on an affidavit of service and disobedience.

"Disobedience to the writ may take the form of neglecting or refusing to produce the person whose presence is sought by the writ, of failing to make a return, of making a false or evasive return, or of refusing to obey the final order or judgment entered in the proceeding. * * *"

This general rule set forth in the above quoted text is supported by numerous authorities from all Federal and State courts of this country, as will be seen from an annotation on habeas corpus in 84 A.L.R. 807–820, particularly Section V thereof which deals with the liability of persons for contempt who disobey or fail to comply with the writ.[5]

■ On the face of the record before us, it is evident that the acts of the Collinses,

5. Lord Watson aptly declared in Barnado vs. Ford (1892) A.C. (Eng.) 326, "A man who parts with the custody of a child after he is served with the process of the court, or evades service in order that he may get rid of such custody, commits a plain contempt, * * *. The case ought to be dealt with, in such circumstances, as one of contempt; and the court has power to pronounce an order which will compel the quondam custodian to choose between placing himself in a position which will make him liable to the writ and bearing the consequences of his contumacy. * * *"

Seniors, in delivering the custody of the child to their son, after being ordered to produce it before the court, warranted the institution of a contempt proceeding. The fact that they acted on advice of counsel does not provide them with a legal excuse. Hence, the important question for decision as to the Collinses is whether their prima facie contempt for not complying with the order of the court, was committed in the presence of the court or an indirect contempt outside of the hearing of the judge.

■ The authority of our courts to punish for contempt is inherent. Nevertheless, our Constitution has provided for curtailment of the exercise of this judicial authority, Section 17 of Article 19 declaring that the power of the courts to punish for contempt shall be limited by law. In conformity with the constitutional mandate, the Legislature enacted Act 2 of 1928, which is now R.S. 15:11 and 12, relative to contempt proceedings.

■ Contempts of court are divided into two categories, direct and indirect or constructive. The direct contempt is committed in the presence of the court and consists of words spoken or acts committed while the court is in session, or during its intermissions, which tend to subvert, embarrass or prevent justice. An indirect or constructive contempt is an act committed out of the presence of the court which tends to degrade the court or obstruct or

thwart the administration of justice. See 12 Am.Jur. "Contempt" Section 4, p. 390; 17 C.J.S. Contempt §§ 2, 3 and 4 and State v. Rodrigues, 219 La. 217, 52 So.2d 756. It is only direct contempts which may be punished summarily without affidavit, pleading or formal charges. 17 C.J.S. Contempt § 71(a).

■ We think it clear that the failure of the Collinses, Seniors, to obey the order of habeas corpus was not a direct contempt but, rather, a constructive contempt committed out of the presence of the court. Accordingly, they were entitled to be cited and served with a rule for contempt in accordance with the provisions of R.S. 15:11, which declares: " * * * provided that no one shall be punished for any contempt committed outside of the presence or hearing of the court, except after hearing upon a rule to show cause why he should not be punished for contempt served upon him at least twenty-four hours before such hearing."

This case, as to the Collinses, is indistinguishable, in our opinion, from our recent holding in State in Interest of Shoemaker v. Shoemaker (In re Shoemaker), 234 La. 932, 102 So.2d 220, where a father, who had been ordered to produce his child in court, did not comply with the order but stated to the judge that the child was still in Ohio where his (the father's) mother had instituted custody proceedings at his

request and direction. It was held that the judge erred in sentencing him immediately for contempt, as the acts of misconduct (which the judge found to be contemptuous) were relator's connivance with his mother to defeat the court's jurisdiction, acts which obviously occurred out of the presence of the court.

In the instant case the judge has found that the Collinses, Seniors, with their son and Mr. Jack, have engaged in a conspiracy to take the child out of the jurisdiction of the court in defiance of the order of habeas corpus, thus defeating and rendering impotent the authority of the judge. If this be true, the misconduct likewise occurred out of the presence of the court.[6]

■ In his per curiam, the judge states that the contempt was committed in the presence of the court when the Collinses and their counsel appeared in open court without the child and brazenly told him that they had sent the child out of the court's jurisdiction. But we do not think that this statement should be considered as a confession of a wilful violation of a court order; the statement itself is not contemptuous nor was it intended to be; rather, it was offered in explanation as a reason

---

or excuse on the part of the Collinses for failing to comply with the court order.

■ The judge further suggests in his per curiam that the relators waived their right to summary process as they requested that he permit them to give evidence, to which he acceded, and each relator was allowed to testify in explanation of his or her actions.

We do not believe that counsel's plea for the judge to hear him and his clients constituted a waiver of their right to a rule to show cause. The record shows that the contempt sentences had been imposed prior to the time the judge agreed to hear relators. Counsel had objected to the imposition of the sentences insisting that relators were entitled to a hearing as to whether they were in contempt of court. This objection was overruled.

The contempt proceeding against Mr. Jack rests on a different footing from that of his clients, for the reason that R.S. 15:11 is without application to attorneys-at-law. The right of the court to punish an attorney for contempt is specially provided for by R.S. 13:4611 and 4612. R.S. 13:4611 limits the penalty which may be imposed on an attorney-at-law to a fine of not more than $100 or imprisonment for not more than

---

6. Of course, if the respondent in the habeas corpus proceeding complies, and he should be required to comply, with Article 808 of the Code of Practice, there appears no reason why he should not be adjudged guilty of contempt, as indicated in the Doran case, in the event he does not show good cause on the return day for failing to produce the person who has been in his custody.

24 hours, or both, at the discretion of the court, for a single contempt. R.S. 13:4612 defines the acts of an attorney constituting contempt. It provides:

"Nothing shall be construed or taken to be a contempt of court by an attorney, but what shall be said, *done or committed directly in the presence or hearing of the court, during its sitting;* and which shall abuse, vituperate or insult any judge of the court, or any other person in or belonging to the court, or resist the authority or interrupt the proceeding thereof.

"An attorney shall not be punished for any contempt of court *except as stated, or for any other cause than one specified, in this section* and R.S. 13:-4611. Nothing in this section shall be so construed as to alter the law for the punishment of persons not obeying any summons, writ or order issuing from any court of record in this state." (Emphasis ours).

▮ This provision is explicit. It plainly denies to the courts the power of punishing lawyers for constructive contempts. These limitations are not of recent origin. They were first enacted in 1855 (see Act 344 of 1855, Section 36) and were afterwards incorporated in the Revised Statutes of 1870 as Sections 124 and 125 thereof. They were then copied, without change of verbiage, in the Revised Statutes of 1950 as R.S. 13:4611 and 4612.

It is fair to presume that the restrictions placed upon the power of the court to punish attorneys-at-law for contempt are founded on the relation of the lawyer to the court. The fact that the attorney is admitted to practice by the court and is an officer thereof, his acts being subject to the scrutiny of this Court in disciplinary and disbarment cases, places him in a position wherein any misconduct on his part may well bring upon him far greater punishment than that which might be meted out by a sentence for contempt.

▮ In the case at bar, Mr. Jack did not commit a contempt in the presence of the court. His language was temperate and respectful at all times. He frankly told the court of the advice he had given the Collinses and their son, [7] and that they had acted on his advice, but this statement is not of itself contemptuous.

The judge, being of the opinion that the attorney conspired with the Collinses to defeat his authority, by advising Collins, Jr.,

---

7. We have purposely refrained from commenting on the propriety of Mr. Jack's advice to his clients as we realize, in view of the judge's castigation of his conduct in this case, that he may be investigated by the Committee on Professional Ethics and Grievances of the State Bar Association. Hence, no innuendoes should be drawn by anyone, who may hereafter consider the case, as to any statements made in this opinion.

that he had the legal right to take the child from his parents' home and bring it to Mexico at a time when his parents (Jack's clients) were ordered to produce it in court, felt that Mr. Jack was amenable to sentence for contempt under the proviso set forth in the last sentence of R.S. 13:4612, declaring that the section shall not be construed as to alter the law for the punishment of persons failing to obey any summons, writ or order issued from any court of the State.

We do not think this provision is applicable to Mr. Jack for the reason that he was not a party respondent in the habeas corpus proceeding. The theory of the judge that, since Mr. Jack conspired with the Collinses and their son to obstruct justice, he, thus, became personally amenable to the order of habeas corpus, does not appear to be sound. The proviso contained in R.S. 13:4612 applies only to cases in which the attorney is a party summoned or respondent to a writ or order issued by the court.

For the foregoing reasons, the writs heretofore issued are now made peremptory and it is ordered that the judgments of contempt rendered against relators, Mr. and Mrs. Nereus W. Collins, Sr., and Whitfield Jack, and the sentences imposed upon them, be . annulled and set aside, this without prejudice to the right of respondents, Suzanne Collins and the trial judge, to proceed against Mr. and Mrs. Nereus W. Collins, Sr., for contempt of court in accordance with law.